Petitioner for Sustained Enforcement Administration, Mr. Baer for the petitioner, and Gay for the respondent. Good morning. Good morning, your honors. My name is Douglas Baer, counsel for Dr. Peter Kelly. Dr. Kelly has joined me this morning, your counsel, please. Dr. Kelly petitions for review of the decision of the DEA Acting Administrator to suspend for a year his DEA registration based on his failure to immediately terminate his employee, Vicki Mullins, after he caught her misusing his DEA registration. Had Dr. Kelly consulted with counsel at the time, no one would have anticipated the decision that the Acting Administrator ultimately reached. No one would have concluded that DEA regulations were precedent required that Ms. Mullins be Why do you say that? Why do you say no one would have so advised? Because if you look at the precedent and you look at the only regulations that relate to employees, none of them anticipate a situation that Dr. Kelly faced. None of them address or establish a requirement that you fire an employee that you catch doing something wrong and certainly given the precedence that a one-year suspension was reserved for cases involving diversion by the registrant himself or herself. What about No one, I'm sorry, just to finish. No one would have anticipated that he would have faced a one-year suspension for not firing her immediately. I'm sorry, your honor. What about the regulation cited in footnote 30 of the Administrator's opinion on page 71 of the appendix, that's 1301.76a, which says the registrant shall not employ, as an agent or employee, who has access to controlled substances, any person who has been convicted of a felony offense relating to controlled substances? Well, she didn't have access to controlled substances. She was the insurance clerk. The other regulation, the one cited by DEA in the order to show cause, requires the registrant to evaluate the employee, look at the conduct the employee was involved in, but look at all the other circumstances in determining how to respond to employee misconduct. Right, and there's a question about that's non-practitioners. Right, right. Ultimately, the Administrator said, I'm not sure that applies because it seems to apply to non-practitioners. But that was the regulation cited by DEA in its order to show cause, and that's the regulation to which we responded at the hearing. Right. What about the supervision situation? This is a multi-office outfit with the three employees, right? Well, there's Dr. Kelly and two employees. Yes, with the three individuals, the three personnel. What is the supervision situation of Mullen? I assume she's working alone on the lot. Well, prior to this incident, prior to Dr. Kelly's discovery, she would be in the office herself, I believe two days a week, maybe three days a week, when Dr. Kelly was in other offices. So Dr. Kelly and Ms. Sainal, who was his office manager, et cetera, would go to the satellite offices twice a week. So I think he was in her own office, I think, Monday and Thursday, the other two offices, Tuesday and Wednesday, and on Friday was paperwork and other things. So during the time that this scheme was active, yes, she would be there and not be supervised on Wednesdays, which I think is the primary day that a lot of these faxes came in. Once Dr. Kelly became aware of this situation, after he reported it to the police, and the police had taken no action, after he reported it to DEA and DEA took no action, he decided to keep her on temporarily to train his replacement. At that point, he took her key away so she couldn't come into the office without someone else letting her in, and approximately ten days to two weeks after he caught her and terminated her, he hired her replacement, and from that point forward, her job was to train that replacement, and we can anticipate that they would have been in the office together. Ms. Senow, when she was in the office with Ms. Mullen, testified that she supervised her much more carefully, and we know that Dr. Kelly took the fax machine away, which was the primary methodology through which all the refills were done. But do we have evidence squarely saying that she was not alone in the office during that five-week period? We don't have evidence either way, and that's the frustrating part from our point of view. You know, the case was tried, the government, the DEA was represented by two individuals, by the prosecutor or the DEA counsel as well as the administrative law judge who represents the administrator, and what the acting administrator does in his opinion is he cites the absence of evidence, not the presence of evidence. He says, well, you didn't, you know, Ms. Senow testified that she could have done the insurance work, and the acting administrator says, well, you didn't provide any evidence that she couldn't be replaced, but that wasn't an issue with the hearing, and if you look at what was testified to, Ms. Senow was the office manager, so she ran the office. She interacted with all the patients. She was Dr. Kelly's assistant and accompanied him and assisted him in the treatment of patients. She traveled with Dr. Kelly and ran the other two offices by herself, and another important point which we didn't emphasize in the brief, and I apologize for that, is she was a licensed x-ray technician, so if anybody needed to take x-rays, she was the person to do it. Let me ask you, you say that as far as the situation at the time, no regulation and no case would have indicated a one-year suspension. As I read the administrator's, acting administrator's decision, his view was that no one in your client's position could reasonably retain in his employ a person who had violated the law in such serious ways and admitted it, that if DEA is going to register people, it wants to be sure that the entity where the registration applies is as clean as possible. So what was DEA to do, in your view, when it issued an order to show cause, saying, here's our evidence, now you tell us why we shouldn't take adverse action against you? Well, first of all, the primary focus of this hearing was on whether Dr. Kelly was responsible for Ms. Mullen's misuse of his DEA registration, and that was the primary focus. I would point out that as the Administrative Law Judge noted, DEA in its post-hearing submissions didn't even address the issue of whether her continued employment was a basis for revoking or suspending his DEA registration. It wasn't a big issue for them, it wasn't a big issue for us, we addressed it. Was it any issue? Well, yes, Your Honor, we addressed the regulation which said when you find out something's wrong, you need to address it, and Dr. Kelly testified to how he addressed it. And, you know, the Acting Administrator, who has never run a small private practice, dismisses the fact that this is a practice that exists on insurance, as most doctor's offices do. And, you know, there's no evidence of the contracts with the insurance companies, but clearly you have to keep up to date or they won't process your claims. And Dr. Kelly made what we believe is a rational decision that in order to protect his practice, he needed to keep her there long enough to train somebody. So let me ask you, what were his options in terms of getting pre-approval of retaining her? Was there any such option available to him? To get pre-approval of what, Your Honor? Retaining Mullen. None that I'm aware of. As I say, he reported to DEA, and DEA has taken the position in a different case, one we cited in our brief to the dentistry, that a registrant is required to notify DEA of misuse of a registration because DEA can cancel that registration and issue a new one. DEA didn't do that. They didn't suggest that. They took no positive steps to address this issue. He reported it to the police. They took no positive steps to address this issue. They knew she was in his office. They knew she continued in his office, and yet they neither arrested her as I would have done or suggested be done, nor had they advised Dr. Kelly that she was such a threat, an obvious threat to the safety of this community, that she needed to be terminated immediately. And ultimately, judges, I think the problem I have, and the really weakness in this decision, is there is no evidence that her presence in that office provided her with any additional ability to continue the scheme that she wouldn't have had outside. A cell phone. Mr. Baird, that's a very strange argument. I mean, if somebody is in the employ of a doctor with prescribing privileges, they have more access to people in a Walmart who know her, and they know that she's been fired versus know that she's working there. It makes a big difference in how much she's able to coast on the understanding. And she's someone who's done this before, been convicted of a felony, and then persisted to the idea that, oh, well, now she's been caught, things are going to change. It's very strange that he wants her to train her successor. I mean, would you want a felon who betrayed your trust to train her successor in your law office? The answer is no, but think of the alternatives. He had no problem with her ability to handle the insurance. She had done that in a trustworthy way. What she had done was the prescription stuff. That's different. He made a judgment, weighed the evidence, and decided that he couldn't replace her immediately and keep his practice active. But in terms of the telephone, Your Honor, first of all, she didn't use her real name when she called in the prescription, so they didn't know who she was. And I could call in right now from this office, from this stand, and if I knew Dr. Kelly's DEA registration number, which she did, I could call any pharmacy in Roanoke and I could call in a prescription saying I was either Dr. Kelly or I was calling on behalf of Dr. Kelly's office. I investigated cases where people made up doctors. They got a DEA number. They got a telephone. They would put the telephone in a room where nobody would answer it. They would call in a prescription. The pharmacy wrote it down, filled it. They might or might not try to call the number, and we pointed out that in this case there was no phone verification evidence at all. No evidence, but presumably if they're calling and Mullen is the only one there, when everything's working as she's designed it to, she picks it up. There's no evidence because she's the one alone in the office, who continues to be alone in the office, who picks up and confirms when the pharmacies seek verification. I mean, isn't that a fair inference? There may have been inferences that it happened up to the point she got caught, but from that point forward there's no evidence. But the testimony of the DEA. We don't have any evidence of prophylactics either, do we? I'm sorry. The only evidence in the record from the DEA witnesses was that there was only evidence of one phone call over five years. That was intercepted by someone other than Mullen. No, no. It was documented in the pharmacy records. The pharmacies would document if they in fact verified the prescription. That wasn't done. The other thing is even though Dr. Kelly notified the Walmart pharmacy that his registration had been compromised, they continued to fill prescriptions, these illegal prescriptions. So, you know, and the administrator cites that, but how can Dr. Kelly be responsible for the irresponsible and I would say illegal acts of the Walmart pharmacy in filling the prescriptions having received notice that the DEA member had been compromised? Why is she indispensable? In other words, why can't you keep the practice running in the five-week period without her? Because there would be no income. All of the insurance pays for that. But what if she, I mean, you know, people are incapacitated all the time through illness or disability and you have to adjust in workplaces, and that happens constantly every day, of course. And here there was obviously a recognition that you couldn't have her around long term, so why not do it immediately? And the defense to that seems to be, well, she was indispensable to the practice, right? Is that a theory? Certainly Dr. Kelly's testimony at the hearing was that she was indispensable at the point until he could hire someone to take her place. And he hired someone within 10 days or two weeks, and then Ms. Mullen took on the responsibility of training that individual to fulfill her responsibility. So really what we're talking about is essentially a two-week, 10-day to two-week period according to the testimony. Ann, I think ultimately. I understand this is a harsh sanction. I understand your concern about that and the vagueness of the standard I get, too. But they're really questioning, I think, the judgment of you can't have her around, but my practice is so important to keep running that I need to keep her around to train the next person and to keep it running. And that's a judgment call that in retrospect looks shaky, I guess. It's still a harsh sanction, I appreciate that. Yes, and that's really our point. We're not saying there shouldn't have been some sanction or some future sanction, but the ultimate question is that the acting administrator is asked to address is, as I look at his actions in 2012, can he be trusted going forward to conform with the Controlled Substances Act and the requirements of the registration? The purpose of the act is not to punish him for making a bad decision, but can he be trusted to comply? And we submit, for all the reasons that are outlined in the brief, that this one decision with which the acting administrator disagrees is not such an indicator of future conduct. Well, there was a past, was it a consent order? Dr. Kelly had a problem back in 2005, and part of that was that he had had some record-keeping violations and that he was supposed to... Right, there was a consent order with the state in 2005 over inventory for controlled substances he used in his practice. They came in and monitored him. They signed off on his inventory practices. When DEA came in 2013, they said, no, no, no, that's not right. You're doing what's called a perpetual inventory, which means when you take a pill out, you record it in your log and indicate that now you've got one fewer, and DEA... So is his position that the perpetual inventory methodology had been approved by Virginia during the 2005 consent order period? Yes, Your Honor. The record shows clearly that he was put on probation. They sent somebody in to review his practices, and it was approved. Also, I would just point out... The perpetual record-keeping is distinct from the biennial and initial inventory counting? I'm sorry? Virginia did not require the initial inventory hand count and the biennial hand count? Well, they required an initial inventory, but that would have happened well before 2000 when he opened his practice. So that was water under the bridge. There was no way to recreate that. But the biennial... They did not require a biennial. The Virginia did not. That's correct. At least there's no evidence that they did. But there's no evidence that they did not. Well, Dr. Kelly's testimony was that his practices were consistent and had been reviewed by Virginia, and there's no contrary evidence to that, Your Honor. Counsel, let me ask you. You know our standard of review gives us very limited scope, particularly in areas of sanction. So in thinking about this case, you do not suggest, as I read your brief, that had the focus of the hearing been on his failure to terminate Ms. Mullen immediately, that you could have offered other evidence or made other arguments. As I read your brief, your case has been presented. So the ALJ moving your client's favor, finding your client was a credible, persuasive witness, and that while there was a lot of blame here, what happened with Mrs. Mullen was not blame that could be attributed to your client. The acting administrator takes an entirely different view, and the question in my mind then would be, and I don't see you quite making these arguments, but I know your point is it's a new rule. You didn't have notice. It was not notice and comment. But it's not that the acting administrator failed to consider some of the evidence that has been presented. Rather, you disagree with his analysis of it. Can you disabuse me of that understanding? Well, I believe there are some points of evidence that he failed to address, such as the fact that Ms. Stengel was the x-ray technician and necessary to perform that service in the offices that Dr. Kelly has. I think the other point is, in terms of the substantial evidence, is a lot of what he relies upon is evidence that's not in the record, that was not elicited by either DEA or by Dr. Kelly. And from that absence of evidence, he draws conclusions, which is not consistent with the standard that his decision be based on substantial evidence. And so specifically you would identify what? For instance, the question of whether Ms. Stengel could have done Ms. Mullen's job and someone else could have done her job. That's a big one. Whether, in fact, these are questions that Judge Blard raised, what was the exact level of supervision? I mean, the Acting Administrator takes a position where you didn't put on clear testimony that she was never by herself, therefore I'm going to assume that she had access to the telephone in the office unsupervised. But there is some testimony that she was supervised by Ms. Stengel when she was there, and she couldn't get into the office by herself as she had done previously because she had the key taken away. On the inventory, is there anything else? I believe there are, Your Honor. Unfortunately, I can't recall them all at this time. I think they're set out in our brief. But there are other places where he says there's no evidence on this particular point and then goes forward to draw conclusions. There certainly was not a lot of evidence on how the insurance, I don't want to say recovery, but how the insurance claims process worked and why Dr. Kelly might have felt that he couldn't wait a week or two or even longer to keep that process going. I'm sorry, Your Honor. So with respect to inventory, what I was thinking of is on page 25 of the appendix, the Virginia Board of Medicine consent decree refers to failure to establish an initial inventory and failure to maintain an accurate current inventory of controlled substances. And the failure to maintain an accurate current inventory was precisely one of the bases here, not the principal basis, but one of the bases. And it just seems that it's more clearly fair to rely on that where this has been a problem in the past brought to Dr. Kelly's attention and where the practices still are nonconforming. First of all, the acting administrator makes it pretty clear, I believe clear, that the inventory violation and or the other one involving the office manager did not independently support the one-year sanction. And I think the cases we cite in the brief show that prior inventory violations did not support a sanction of a year. Second of all, in terms of Dr. Kelly's inventory practices, as part of that consent decree, as I pointed out, the State of Virginia came in. They inspected his conduct while he was on the consent decree, found it to be compliant with the state regulations, and dissolved the decree. The issue with inventory, it's a somewhat unique issue because he had an inventory. The inventory was accurate except for three pills. The problem was it didn't quite match what DEA required in the sense that he didn't open the bottles that were otherwise sealed and count them every two years. But if the idea of the inventory is to keep track of what is in the closet, he did that, and he did it accurately. And as soon as DEA pointed out the fact that he wasn't quite in compliance with what their regulatory scheme required, he changed. Go ahead. What is your understanding, then, of the legal requirement regarding remorse? Because the active administrator focuses on that. You've written an article about forgetting to say you're sorry. So that question in my mind is, is that what's lacking here, and that's what triggered the administrator's view that a year was required? If I had to take a guess, as I read these opinions, quite frankly, I see a lot of anger on the part of the acting administrator in both the decision and order. So if you ask me what motivated it, I would say it was anger at the whole situation. I wasn't clear then. What I was focusing on was what is the case law in terms of what is an expression of remorse The acting administrator focused on that, and it's not quite a magic word test, but it is something along the nature of acknowledging on the record some acceptance of responsibility. Is that your understanding of it? And if it's not, then was the acting administrator holding him to a standard that was not required? The case law articulates a standard that says that you have to come in and essentially accept responsibility for your wrongful acts. Having practiced in this field for over 30 years and having written a law review article on that exact point, I'll tell you I don't understand it because it seems to me as you read the cases, the acting administrator finds responsibility when the DEA wants to and finds a lack of acceptance when they don't. As a practitioner, you go into a hearing and you are confronted with an interesting situation. You have to defend against the claims in the order to show cause, but yet if you don't accept responsibility, and quite frankly, oftentimes the acceptance of responsibility is the abject admission that the DEA is correct in what they say you did wrong and you admit you did it wrong. As a practitioner, I'm not sure how you handle that situation. In this case, Dr. Kelly came forward and he honestly, as the ALJ found, explained what he did and why he did it, and he didn't deny that he had kept it wrong. He didn't deny that those were his inventory practices. He didn't deny that he gave his nurse the medication to give to the patients. He accepted, and certainly in the inventory situation, he quickly changed. Once it was pointed out it was wrong. In terms of his nurse's practice, he changed that even before the order to show cause was issued. Well, he did act as if he did not know the scope of Mullen's diversion when, in fact, he had much broader than, and that clearly would be in the bonnet of both the ALJ and the administrator, and they quoted verbatim several different times. And I think the explanation for that, Your Honor, is this. I think what Dr. Kelly was trying to communicate is I knew she was involved in the illegal activities. She admitted it to me. I knew of at least seven prescriptions, or I think it was seven, at the Walmart, and I checked the PMP and I found a number of prescriptions issued in her name with my DEA registration. What I think he was trying to say, Your Honor, is I was not aware of the scope of her profidity as demonstrated at the hearing, that it was so much broader and so much greater than what he knew. So he didn't deny that he knew she was involved in this. He certainly didn't know she'd been involved in it for five years. Right. So the administrator quotes what he said, which was, it was only with a handful of information that I had, less than a dozen. And then the administrator says, by August 24th, he knew that she had obtained more than 5,000 dosage units, 10 milligrams, the strongest dosage in 780 dosage units of Zolpidem. So it struck, I think, both the ALJ and the administrator as a denial of the, or a failure to really acknowledge and come to grips with the severity of the situation. And that was worrisome. Is this person going to, is he taking this seriously? Well, I don't think he would have. I don't think he would have. He certainly, if you'll excuse the expression, acted as if his hair was on fire when he found out about it. He called the Commonwealth's Attorney's Office. He called DEA. He called the police. As soon as the police officer, who had previously arrested Ms. Mullen and failed to do so again this time, or previously prosecuted, I don't know that he'd arrested her, told him about the prior cases, he looked it up. He looked at his PMP. He certainly investigated this on his own. He didn't stick his head in the sand. He didn't count the number of dosage units, which is what the administrator focuses on. He looked at the number of prescriptions. But he didn't say that, he didn't testify that those prescriptions were illegal or that they didn't disturb him. He was quite disturbed by this image. The odd thing, I suppose, from the other perspective is because he acted with his hair on fire and did all those things that you suggested, he obviously knew it was a serious situation, and yet leaves her there in place for another five weeks. And that's the part that's at the heart of this. And that's that disconnect between hair on fire and doing all the things you say and leaving someone in place. Hiring and firing decisions are very difficult. I get that. But when you have someone who's done this and your hair's on fire, isn't it reasonable for the administrator then to say, well, if we just can't, that's too great a risk to public safety to have someone with that degree of wrongdoing in such a position of responsibility, and something should be done about that. And I would respond to that in two ways, Jeff. One, contrary to what the acting administrator says, I think Dr. Kelly has a right to rely on the police to some extent. Officer Finley, who was part of a DEA task force and a Virginia State trooper, and the man whose responsibility was for diversion of controlled substances in southwest Virginia, left her in place. He knew she was still in the office. But they had a different role, right? I mean, if you're running an office and you have someone who's been doing that degree of wrongdoing, and we can debate what the degree is, but a degree sufficiently that, in your words, his hair was on fire. Yeah, but, you know, you've got a police officer whose job is to protect the public. That is his only job, right? He's arrested, he's prosecuted her before for similar conduct. She confessed to a felony, which means he could arrest her without a warrant. He didn't advise Dr. Kelly at all as to what he might want to do to protect the community, which Officer Finley was obligated to do. He didn't arrest her and remove her, which would have put her under the jurisdiction of the court, and she could have been ordered under house arrest, she could have been ordered to give up her cell phone, she could have been ordered to turn off her phones. The court could have put in place even better strictures than Dr. Kelly could, because once she leaves the office, she can go home and pick up the phone and call the same pharmacy and call her prescription. I understand, but, you know, at least he could have done more. This is the counter view, and I'm not saying which way I'm leaning, I'm just giving you the counter view so you can respond, is yes, she still could have gotten around the restrictions, but he could have done more, depending on what the theory goes, to reduce the risk by firing her immediately. And that's the theory, Judge, and I don't believe there's any basis for it set out by the acting administrator, as he's required to do. I recognize there's not a basis set out by the ALJ or the administrator, but why didn't Dr. Kelly seek to have a new DEA number reissued? Is that not something one can do? I'm not sure he was aware that he could. He certainly wasn't advised by DEA that they could do that. Yeah, no, I recognize that one would think that would primarily be their responsibility. It's like when you have a credit card fraud, and the credit card company is very quick to say... We'll give you a new number. ...you can't keep that one, even if you think you may find it in your dresscoat pocket tomorrow. Yeah, as we read the newspaper, we see DEA holding all sorts of other people responsible for criminal activity except themselves. They lean on the drug distributors because they're not adequately supervising the pharmacies. They get the pharmacies because they're filling prescriptions they shouldn't fill. What do you think the maximum appropriate sanction would be, given your view of the facts? Based on the cases that we've cited, I would say the maximum would probably be six months, and that may even be too long. Six months, so six-month suspension? Yeah. I mean, you know, the acting that the ALJ suggested that wasn't your suspension, but essentially a probationary period to allow him to avoid that. What does it take for him now? I mean, he's served most of the suspension. What else does it take? His participation in insurance. As we indicated to the court in our emergency motion for a stay, he's been notified by Blue Cross Blue Shield that they are in the process of terminating his participation. Has that happened or not? He got the letter saying we're going to move to terminate. It gave him the right to file an appeal. He filed an appeal. He's waiting for a final decision. Why don't we hear from DEA, and then we'll give you some time on rebuttal. I'm sorry, Your Honor? Could we hear from DEA, and then we'll give you some time on rebuttal. Good morning. Good morning. May it please the Court, Anita Gay on behalf of DEA. The acting administrator's decision is supported by substantial evidence. The evidence established that Dr. Kelly employed a serial diverter who had diverted 127,000 doses of hydrocodone, 5,000 doses of Ambien. She had a prior criminal history for the same conduct in 2009. She continued to work for him and divert while she was on probation for her 2009 state charges. He learned all of this within four days of finding about the two suspicious prescriptions in August. And on August 20th, he learned about the fax, the fax refill that was sent over. Within four days of that, he looked at the PMP system, the Prescription Monitoring Program for Virginia, learned the scope and the breadth of her diversion. He also found out about her state case, saw that she had no regard for the law, because during the time that she had been under state prosecution and, in fact, on state probation, she had worked for him and continued to divert and continued to obtain fraudulent prescriptions. But don't – he recognizes that she can't work there anymore. And the question I gather is, in such a situation, and this happens in workplaces every day all over the country, you know someone's committed some wrongdoing and can't work there anymore. Do you march them out immediately, or is there some minor transition period before you march them out? And arguably, in retrospect, an error in judgment in allowing her to stay there, even with the precautions. But is that a – you know, does that rise to the level of a one-year suspension, I guess, is the question before us? Because you're coloring the fax, but I don't know that that's really in dispute. But what's in dispute is, is it reasonable to have someone around for five weeks after you know they shouldn't be there permanently anymore? No, it was not reasonable to have her around for five weeks, given the scope of her misconduct and also his additional misconduct that was found, his record-keeping violations. And as the court pointed out, these were the same record-keeping violations that he had in 2005 when he had entered into the – I know, but the administrator said the only reason he was imposing this sanction was Dr. Kelly's decision to retain her. Yes, the administrator gave the greatest weight to the retention of Ms. Mullins. So it's like other crimes evidence is out of the equation here, as far as – I know – I found the active administrator's decision interesting in that regard, because the only reason I'm doing it, and then these other things sort of support what I'm doing, but if the only reason is because he retained her, then the regulation, which now says you should assess this misconduct, has to now be read to say, and if there's been any prior diversion, you must immediately terminate your employment of that person. Well, the acting administrator specifically did not apply that regulation. I understand, but I'm talking about a practitioner who's out there in the real world trying to comply, and the regulation says assess. That's the best you can figure out. And so he assesses, and he calls everybody you can reasonably think of and tells them about this person, and then he says, now what am I going to do? And so he basically puts her in a gilded cage so she can train this other person. Well, actually, she was not in a cage. She was unattended. Well, that was a figure of speech. I mean, he locked up the fax machine. He had his other secretary supervising her in the sense that they were rarely alone. That's all I know. Well, there is no record support for that statement. What statement? That she was supervised by the other employee. She was supervised, but in the presence of. Well, the other employee is the office manager, and she travels with Dr. Kelly to his other offices. So Ms. Mullen was left unattended. Is there any evidence that during that five-week period she was actually traveling, and therefore Ms. Mullen was unattended? Yes, her testimony was that she would go to the other offices with him. She would assist him. During this five-week period. Was left unattended and that she was left there. Now, while the fax machine. Can you give us your best record state on that, because that's kind of important. You think your associate may be able to get that to you? Okay, I will have to provide you the site on that. But what happened, as I said, is that the acting administrator did not rely on the regulation. Instead was looking to factor five under the five-factor test of such other conduct which may threaten the public health and safety. I mean, the whole point of the Controlled Substances Act is to protect the public health and safety. So at some level, any violation of any part of it could be found by the administrator to be something that may pose a risk to the public health and safety. Why isn't that argument just vastly overbroad? Well, you're correct. The entire purpose of the Controlled Substances Act is to have a closed system, so that illegal and legal dispensing of controlled substances may be monitored, detected by the DEA. And that is why a registrant has the duty to protect the public and to protect the registration, which Dr. Kelly fails here. What sets this apart from what your honor is asking, saying that, oh, there's a technical violation, so therefore you violated and therefore you lose your registration. You have to look at all of the evidence. And when you look at all of the evidence under the very deferential standard of review by this court, you will see that there is substantial evidence supporting. As I was explaining, the actions of Ms. Mullen, Dr. Kelly's prior conduct in 2000 with his own state controlled substance issues, which, again, was given little weight, but then you also look at his record keeping. He had had prior issues in 2005, and then he had exact same issues several years later. He had allowed his office manager to dispense. And instead of coming in and saying, you're correct, this was wrong, and this is how I've remedied it, he came in with excuses, with justifications. To some extent. I mean, he's explaining his situation, but he also did say this is wrong, and he did correct. Let me ask you about, I had a question about the retroactivity holding. So the administrator says that it would be retroactive to hold Dr. Kelly accountable for having to show due diligence regarding his federal DEA registration, potentially having been subject to abuse, based on the fact that he had reason to believe that there was abuse of his state prescribing authority. So they said that is going forward, you have that affirmative obligation to do due diligence, but we're not going to apply that because you didn't have reason to know. Why isn't it equally a new duty or retroactive to construe the duty of acting in the public interest as requiring the immediate firing of someone like Mullen? I mean, it seems like, to me, maybe neither of those is particularly retroactive, or both of them might be. I'm not sure I see the distinction. Well, looking under Factor 5, there is nothing different that was applied to Dr. Kelly that hadn't been applied to other registrants, and that is to look at whether there is acknowledgement that something had been done. But that's at a very high level of generality. What about, they're saying you should have fired someone who's a serial diverter. What should have put him on notice, that he should have immediately fired someone who was a serial diverter? Well, once he found out about the Chief Fraudulent Refill Request through the facts on August 20th, and then within four days he knew that she had the prior state charges, that she had been on probation and had no regard for the law because she continued to divert while she was on probation, and so she had no regard for the law. But he was willing to assume this risk and keep her. I mean, he put his own self-interest over the interest of the public in his obligation. You really haven't answered the question about what should put him on – I mean, the other thing is, it's true that other people's failure to fulfill their obligations don't excuse Dr. Kelly's failure to fulfill his. I understand that. On the other hand, put yourself in Dr. Kelly's shoes. How obvious is it that he is supposed to treat her like someone who is really dangerous and needs to be out of his office when the police on her first felony failed to even notify him? The pharmacies don't really check on the prescriptions. If there's a missing DEA number, they still fill them. The DEA doesn't cancel his DEA number when they know it's been abused. The sentencing judge of Mullen in the first criminal case apparently knew she was working for Dr. Kelly and let her go back to work there without any warning. So the notion that it's supposed to be crystal clear to him what you do in this situation, clamp down. Nobody else is clamping down. Well, one of the things is that the pharmacies did check on the prescriptions. What they would do is Ms. Mullen would call them in and would not have to give the DEA registration. There was testimony from one of the pharmacists who testified that she would call them in and we had Dr. Kelly's DEA registration number in our computer on our file, so that didn't need to be there. On the refills, they would fax a refill request to the office. Ms. Mullen was in the office alone every day of the week except once, and she would stamp them with his signature stamp and then send them back authorizing the refill, which is how she was able to divert 127,000 doses of hydrocodone to herself, her son. How is that responsive to my question, which is, how was Dr. Kelly supposed to know how decisively and harshly to treat Ms. Mullen when nobody else who had interacted with her over drug-related felonies and diversion reacted in a commensurate way? DEA did not cancel and reissue the number. Why not? In 2008, there were Tramadol prescriptions, which at the time was not a federal controlled drug. In this situation, 2012. In this situation, DEA began an investigation, but the argument today seems to be, well, they did not take her into custody. Or they didn't cancel his registration number. Why didn't they do that? Credit card fraud, cancel number, issue new one. Here, as everyone seems to be saying, there's a lot of diversion that goes on without rechecking. So cancel number, put it on a blacklist, give a new number. Isn't that going to help the DEA in its mission? I'm just curious why that's not the action. It could have helped the DEA. He did not ask them. He asked the pharmacy to shut down his DEA registration. Seriously? Talk about not taking responsibility. No, he asked the pharmacy. When you talk to the Walmart pharmacist, he asked her, upon the discovery of the 2-fragile, and he asked the pharmacist to shut down his DEA registration. But despite that, they still refilled 10 to 12 of the prescriptions that were outstanding. So there were additional scripts issued after the time that he became aware of her misconduct. But that can't be on his head. I mean, he could have asked for it. DEA could have changed it. But that still, even if they had shut down his DEA registration, that does not take care of his failure to terminate Liz Nolan at the time. On the fair notice point that Judge Pillard is raising, if there had been a rule in place that said if you discover a serial diverter working for you, you must immediately terminate, if there had been a rule to that effect, and he had violated that rule, that would be a pretty easy case. But the problem, I think, is that you have this vague factor, factor five, such conduct which may threaten the public health and safety, and you're not necessarily on notice that you have to march someone out that day when you discover them, having committed something like this. So there's a fair notice, I guess we're Sessions versus DiMaio, aftermath of vague laws that don't put you on fair notice of what you're supposed to do in a particular situation, and then when you guess wrong, you're sanctioned. How do you respond to all that? Well, there's definitely, I mean, he's entitled to have due process. He's entitled to know what the requirements are, what the rules are, and he knew that he had a duty to protect the public. Yes, absolutely. That's, again, a level of generality that's very high, and he knew I can't employ her anymore, but he also thought she's not such a daily risk, not like a ticking bomb in the office, that I need to throw her out immediately. And the question is, is that such a, what would have put him on notice that that's wrong, or is it just so obvious that any rational doctor would have, I mean, that's really what you're saying, is any rational person in that circumstance would have known you have to get rid of her that day. Right. First of all, she was such a ticking bomb that she should have been terminated immediately. The scope of her diversion, which he tried to minimize, he tried to say, I didn't know about it until later. But let me just go briefly to the issue of the notice, and under Dr. Kelly's standard, he would think or he would request that DEA codify or that Congress codify every specific instance of what could occur, and there's no requirement under the five factors public interest test to do that. I agree. I'm just curious. I mean, I understand your point. I followed your point. But I'm just curious why that wouldn't be the same with respect to the due diligence analysis, that once you find out that a subordinate is abusing your state prescription privileges, it would stand to reason, without any precedent or regulation, that you might want to check up on diversion more generally, including by checking into the abuse of your DEA registration. And yet, I'm just curious about what your logic is, if that's a DEA decision to treat that as not flowing as a matter of course from the general responsibility to protect the public interest. He did have an obligation to find out the scope of the misuse of his DEA registration, which he did. But then in the hearing, he minimized what that was. He said, I didn't know. But my question was, given what you say about the duty to fire Mullen flowing from the more general duty to protect the public health and safety, why is that same logic not adequate to support a duty applicable to Dr. Kelly to, once he knows of state diversion, check into possible misuse of his DEA registration? Same logic. Why hesitation to apply it in this case, because doing so would be retroactive? If you are right, then it's enough notice that that's an obviously risk to public safety. Well, the acting administrator was very, as you can tell from the lengthy opinion, was very thorough and very cautious about what he gave weight to. I mean, he did not give weight to the… A distinction? Do you have a distinction for me between those two situations? No. It appears that the acting administrator was being very cautious and not holding him to a burden that is going to be prospective to say, one must do this in the future and wanted to make sure that that is setting forth standards for guidance, which is what the public's opinions do. But it still does not alleviate the misconduct of Dr. Kelly and how he failed to acknowledge that. I mean, every turn he had an excuse. When he let his office manager dispense, he tried to claim that there was an exception under the dispensing rule. When he failed on the recordkeeping, and I think Judge Rogers had asked about that on the recordkeeping under footnote 30 of the decision, and it specifically addresses the recordkeeping and the misconduct of Ms. Mullen. One of the things the ALJ did not do is did not consider the minimization that Dr. Kelly testified about, how he said, oh, I didn't know about the scope of her diversion until after I'd seen it on the news later. Did you agree with Mr. Barrett's characterization of why the administrator didn't rely more on the regulation of 1301.76 in that she didn't have access to controlled substances, and that's why the administrator didn't focus on that regulation? That's the regulation in footnote 30 of the opinion that you just referred to. Yes, well, that is the one that also is – that's where a registrant may seek an exemption from DEA to hire someone who has been convicted of a felony, of a controlled substance-related offense, and she did not have that. She had been prosecuted in state court, and she had completed probation, so she did not – she had not been adjudicated guilty. But if somebody pleads guilty to a felony, they have a conviction of a felony, and she did, did she not? Well, she had pled guilty, but she had completed her probation, and it was my understanding that they did not adjudicate her guilty, so she was not convicted of it. She was not adjudicated guilty of it. She had been prosecuted for it, but it was essentially a withhold of adjudication that was imposed at the end. Do you want to respond at all to counsel's suggestion about the procedural difficulty under the scheme, as he was suggesting? He understands that, in other words, you're excused in order to show cause, and the acting administrator suggests that unless you come in and say, I'm guilty, please be lenient. You have not acknowledged or expressed remorse. We have this situation in another context, a criminal context, about parole, where the board required people to admit their guilt, and this person said, but I'm not guilty. So, I'm interested in this notion about what remorse means. If you, in good faith, and the ALJ had credited Dr. Kelly's testimony, believe that your record keeping is in accordance with what is required, because the state people have told you that, then you find out, in fact, that the federal requirements are different, and you change. Is DEA saying you have to also say on the record, I was wrong not to carefully read the federal regulations or something and understand that I had to do something different with my record? Well, the cases that discuss acceptance of responsibility and remorse, and as Your Honor is aware, what happens is after the government presents a crime of facial cage that acts have been committed that are inconsistent with the public interest, the burden shifts to the registrant. I know it's not the same, but in a criminal context, you're charged, you defend vigorously. If you're found guilty, and then you come before the judge for sentencing, that's when you express remorse. You don't say, you know, or acknowledge that you shouldn't have done what you did. This system is set up appropriately, and that's what I'm trying to understand. I would refer the court to the decision of the Tenth Circuit in McKay. In McKay, Dr. McKay had administrative proceedings pending for misusing his DEA registration. He was a practitioner. Simultaneously, he had a criminal case pending, and he wanted to invoke his Fifth Amendment rights in the administrative proceeding, and the court stated that you do not have a Fifth Amendment right in the administrative proceeding, and they distinguished it and distinguished why, in this setting, you can be required. Just tell me what happens. I'm a physician. I get an order to show cause. I go to the hearing, and I have to say what? I confess? You have to say, when I let my assistant, office manager, dispense controlled substances, it was wrong. Not that I've changed my process because a patient questioned it. Suppose I say, I thought I was in compliance with the law, and here's why I thought that, but you're telling me I'm mistaken, I'm wrong, so I changed. Yes, and then you could say, and here's what I've done to indicate that change. I've taken these courses. I've put in a statement. No, no, no. You tell me I've been keeping my record on yellow paper, and the feds want me to keep it on green paper, so I changed from yellow to green. Do I also have to say I acknowledge I was wrong? Yes. If it's my action, isn't that the inference from my action? Because if I didn't make the change, that would be the problem, but if I've made the change— But you also have to acknowledge what it was that led you to make the change. So it is magic words. I just want to be clear about this, because if you change once you're notified that you need to make the change, you still have to say, I should have known before? Well, you have to say, what I did was wrong. But because you honestly didn't believe it was wrong, because the state told you you could do it this way. Well, the reason that one has to do that is the administrator has to know, has to be confident. I understand, but if you had a procedure, like a criminal procedure, and I acknowledge it's not the same, where first it's a determination of liability, then it's a determination of what the sanction is, but that's not the way your procedure works, I guess. Well, it's similar in that first the government has to present a prima facie case. So that's your order to show cause. Well, the order to show cause and then the evidence at the hearing. Well, the order to show cause says to me, here's the evidence the government has. It's comparable to a charging document, yes. It's more than a charging document. It doesn't say I violated Section 4 or Factor 5. It says in detail what it is the government will prove. Yes. And it may prove more, but here's what it has so far. So tell me why the government shouldn't act on that evidence. And then it goes to a hearing, and at the hearing the government has to support those. And you'll see in the very end. And the government puts it in, and Dr. Kelly makes his best defense. And then there's not a separate proceeding that gives him the opportunity to say, now that the government has determined I did all these things wrong, what is the appropriate sanction? And then Dr. Kelly could say, you know, I beg for mercy here. I thought I was doing the right thing, and here's what I've changed, and here's what I will do differently, here's what I am doing differently, and here's how I will ensure that the public safety will be protected. So it is nice for actions don't speak loudly enough. But if he came in with evidence of his actions, which he did not. He did not come in and say, I terminated Ms. Mullen as soon as I learned the breadth of her diversion. I learned that she was a serial diverter. No, welcome on who makes the decision about what is in the public interest here. And that's a judgment call that Congress has delegated to the Attorney General who's delegated it to the DEA administrator. And that's really the end of the discussion because as a practical matter, the facts in this case are undisputed. It's a judgment underlying the actions taken. Well, there were credibility findings made by both the ALJ and by the acting administrator. The acting administrator wasn't hearing the testimony. But in reviewing the record. No, but he didn't say, he didn't say I overruled the credibility determinations of the. No, but concurred that Dr. Kelly didn't minimize. And I understand it's not a bifurcated system like you would have with a trial and then a sentencing phase in some situations. But at the same time, the case law is thorough and the agency decisions are certainly set out that. Well, I think it's different. Let me just suggest this. The cases everybody is citing are cases where the physician himself was violating the control substance act. Right? He's diverting or she's diverting. And that person is the subject of the DEA action. So here we have an employee. And whether this regulation applies or not, it does signal, at least in some circumstances, the employer has some leeway to assess. And if the employer makes the wrong decision, the question is, does he lose his license for a year, his registration for a year, and basically his business is shut down, so far as the records show. Well, there's also no indication that the business is shut down. And I'd also refer you to the testimony of Ms. Casey, who was brought in. She was a former insurance clerk who had worked for Dr. Kelly. She came in to specifically rebut paragraph 18 of the unsworn affidavit that was prepared by Ms. Mullen that set out what she understood Dr. Kelly's knowledge of her prior and her ongoing diversion. That affidavit was not given weight by the acting administrator because it was unattested. However, Ms. Casey was called in as a defense witness prior to that decision by the ALJ and the acting administrator to rebut a claim that was in the affidavit that Dr. Kelly had had them doctor some inventory records. But what is interesting and pertinent to this court and this discussion today is that she had worked for Dr. Kelly for a number of years as an insurance clerk and described the process. It is not a sophisticated process talking about the explanation of benefits, submitting the bill. She had worked for him for a number of years. She then left. She came back on a part-time basis while she worked at a church. She left for two years from 2010 to 2012, came back again on a part-time basis. So there's no indication that someone like that was not available. The office manager testified that she could handle it. She advertised the vacancy. Yes, but he also could have put his office manager in the position. She said she would quit. She's his ex-wife. Who knows what she would do? I mean, she made what she made. No, no, no. Wait. Wait, counsel. No, no. With all due respect, that's what's in the record. Yes, she worked with him for 28 years. It's unlikely that she would quit. Yes, it's all in the record. No, no. The record is she said she would quit. She did say that. But that's all we're dealing with. You think she was lying? No one ever – I don't know if she was joking. I don't know if that was – I don't know. But there's no indication. In a way, she advertised the job. Yes. And presumably picked the best applicant. But he could have terminated Ms. Mullen, who had this wife conspiracy of delusion. He did terminate her. I mean, he just gave her – that's why – I mean, this one sentence in the administrator's decision, proof that Mullen had committed a single act of prescription fraud should have resulted in her immediate termination. Well, she was terminated. The question was can – I'm repeating myself, but the question really is do you have to march someone out the day of? And in workplaces all over the country, there are people who are found to have committed wrongdoing but then somehow hang on for a week or two or three before they're actually marched out or put off the payroll or what have you. It's pretty rare that someone's marched out the day of. Not pretty rare is too strong, but it happens both ways, right? In the real world and here, it could have been marched out that day but terminated and then said, you know, stick around with some precautions at the Gilded Cage until I get a replacement. Is that a year's – I mean, a year's suspension from that misjudgment? That's just harsh. Well, given his prior history of his disregard for the laws and the rules – I understand. And also, even if he had not done it on the 20th, he had waited four days later until he had a complete picture of what Ms. Mullen had done, which at that point he had her state case. He had information that she had been on probation and continued to divert. He knew that there were the tens of thousands of doses units of hydrocodone that had been dispensed. He had a lot more information after looking at the prescription monitoring program, after looking at her criminal case, that he did not have at the time when he first had the facts about the two questionable prescriptions. So certainly it would be understandable, and we would not be here saying, well, it was unreasonable for him to keep her for four more days. We would never have gotten to this point. But to keep her for five weeks and to leave her unattended in the office when what she would do is phone in Scripps and then confirm on the facts renewals that the Scripps were legitimate. And that didn't happen, to state the obvious. I mean, I know your point is the risk was too much, but it didn't. Just so we nail that down, that did not happen during the five weeks. Right. There were a dozen refills that were issued, but there were no new prescriptions that came to light. But it was a risk that the acting administrator found to be significant, and there are facts to support that. Ms. Kaye, does the DEA have a kind of a watch list of abused DEA registration numbers? Is there like an anti-fraud mechanism so that if I'm a pharmacy and I'm receiving what look like valid prescriptions, I can look at the list and see if it's actually a number that's been canceled by the DEA? Or is there a check in a pharmacy system that would prevent them from filling a prescription on a legacy DEA number that has been canceled? Well, once a DEA number is deactivated, if the pharmacy checks that, it would not come up as an active number. But if the pharmacy doesn't check it, they can continue to prescribe under that number. Right, which would be a violation of their corresponding responsibility to confirm that it's a legitimate script issued in the normal course of medical practice. Presumably they're required in their system to have a flagging, like to be able to input deactivated numbers so that they get an alert? Yes, and they also, I mean, there are red flags that they will be looking for as far as the doses, narcotics that are contraindicated, having long-term doses of OxyContin. I'm just asking at a much less subtle level. If the number is something that the DEA can use as an important control. I'm not aware that the DEA has a suspicious DEA registration number list or anything like that. Or canceled number list. It's my understanding that the canceled numbers would come up if there is a check in the system, that if the number has been canceled or revoked or is inactive, that that would come up. But it would not, it would not, there's not a list of these are suspicious. Like you might have heard of suspicious orders where distributors have suspicious orders and they have to report those. There's nothing like that. Anything further? Just in conclusion, that the evidence and under the very deferential standard, there was substantial evidence and that the sanction was well within the agency realm and that it was not arbitrary and capricious and we ask you to affirm. Thank you. All right. Counsel, give you a few minutes here. Thank you, Your Honor. I just point out to Judge Pillar, the case we cited at page 28 of our brief DEA decision, Kevin Dennis in our elliptical reference notes that Dr. Dennis's failure to notify DEA of the misuse of his registration was cited as one reason for holding him responsible for its continued misuse. So DEA has taken the affirmative position in 2003. You have to notify us because then we can cancel your registration. But when Dr. Kelly notified him, the DEA at the administrator didn't give him much credit for that. I'd like to correct a small mistake that was game-made. Even though the pharmacy has the registration number in its records, anybody calling in a prescription is required by DEA regulations to provide the registration number for the registrar. So the absence of obtaining the registration on the phone-in prescription makes that prescription illegal under DEA regulations and to fill the prescription by the pharmacy is a criminal violation of the CSA. Which is distinct from the practice that is testified to in the record that they don't always do that, but you're saying that as a formal matter they are required. They are required. The case law is very clear. The DEA decisions involving pharmacies are very clear. The criminal law is very clear. It's an indication. To respond to Judge Rogers, the DEA Order to Show Cause does have some detail, but it is essentially a charging document. It's no different than an indictment. It is what they intend to try to prove. DEA puts on its evidence at the hearing. The respondent puts on his evidence at the hearing. It's not even like a criminal trial where there's a finding by the judge at the close of the government's case that they've made out a case. No, it's not bifurcated. That's my point. Right. It's not bifurcated at all. There's no indication that they've satisfied their burden. That burden is just part of the analysis that the administrative law judge makes in his recommendations. So you filed a motion for reconsideration and a motion to stay. Correct. So that was your opportunity to present what I'll call the sentencing plea. Was it not? Not really because the case was still to be decided on the record at the AOJ. Well, first of all, there's no provision in the DEA regulations for such a motion. And it's just like we cannot bring to your honor any additional evidence. I don't believe you could do that in that proceeding. So that's the problem. And to respond to one other point, and Ms. Day said she doesn't believe we'd be here if it's four days after Dr. Kelly reported Ms. Mullen. He had ultimately terminated her completely. I don't believe that's the case. The acting administrator held in his decision that he needed to terminate her immediately. And any concession that he could wait four days, I believe, is a concession that he could wait essentially two weeks until her replacement was found. I think she was saying because that was when the PMP, he had access to the PMP and saw the scope of the diversion. I understand that, Your Honor. I'm just saying that the written decision says terminate immediately based on the knowledge of even one false description. Right. And so at least this decision doesn't allow for even four days. It is a little mystery at the heart of this case how someone would keep someone on to train a new employee who has so fundamentally betrayed his trust and abused his professional privilege. I understand that, but I would point out that a lot of what he says in this decision goes to how Dr. Kelly should have been running his office, the decisions he should have made. And the acting administrator never ran a medical practice. On the one instance, it's this person. And the other instance, he's saying, well, you could have hired somebody to replace this person or to fill in their responsibilities while you shifted this employee from this responsibility to that responsibility. And we would submit it's all in speculation. There's no substantial evidence to support that. There was no testimony on how medical practices are run. Dr. Kelly testified the way he runs his practice, decisions he made within the constraints that he faced. All right. We will take your case under advisement. Thank you, Your Honor.
judges: Rogers, Kavanaugh, Pillard